October 6, 1978

## 78-55 MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, ANTITRUST DIVISION

### The President—Authority to Participate in International Negotiations—Trade Act of 1974 (19 U.S.C. § 2101)—Participation in Producer-Consumer Fora

You have requested our views on two questions presented by the State Department's participation in "producer-consumer fora" and certain other international negotiations aimed at stabilizing international commodity markets. The first question is whether the President, through the Secretary of State, has authority to participate in such negotiations absent statutory authorization. The second question is whether the Trade Act of 1974 (*See* 19 U.S.C. § 2101 *et seq.*) authorizes or permits such participation.

It is our opinion (1) that the President has constitutional authority to participate in negotiations of this kind through the Secretary of State, and (2) that the Trade Act of 1974 does not prohibit such participation. We should add, however, that the question of the President's authority in that regard is quite distinct from the question whether any agreement or recommendation accepted by the President or the Secretary of State would have any effect under the law of the United States. We understand that your principal concern is with the impact of these agreements under the antitrust laws. Because there is considerable uncertainty regarding the legal effect of naked executive agreements generally, legislation prescribing this impact may be desirable as a matter of policy.

### I. The Background

The facts are as follows: A producer-consumer forum (PCF) is an intergovernmental body convened for the purpose of making recommendations or agreements concerning international trade in particular commodity markets. Representatives of private industry are in attendance, but their official role is limited to rendering advice to Government delegates. Recommendations or

agreements reached at a PCF are made by and among the government delegates and are submitted for implementation to each member government. Member governments and private parties within member countries are not bound by these recommendations or agreements. Whenever a government agrees with a PCF recommendation, it may take informal, nonmandatory action to implement the recommendation. This action would normally be directed at the affected industry within that country. Formal implementation by treaty or legislation is uncommon. As a matter of practice, the United States takes no steps, either formal or informal, to implement PCF recommendations or agreements within the United States.

## II. The Constitutional Issue

Since the founding of our Nation the President and his representatives have engaged in negotiations with representatives of foreign countries over matters of national and international concern. Many of these negotiations have produced formal or informal agreements, and many have never been submitted to the Senate for approval under the treaty clause or to the full Congress for implementation or approval by statute or joint resolution. *See* L. Henkin, *Foreign Affairs and the Constitution* 173 (Foundation Press 1972).

The legal status of executive agreements that have not been authorized or approved by Congress or by the Senate under the treaty clause is a subject of considerable complexity, but we think there can be no real argument over the threshold issue: The President and his representatives have authority to engage in international negotiations on any subject that has bearing on the national interest, even in the absence of prior statutory authorization. The source of this negotiating authority is the Constitution itself. Negotiation is a necessary part of the process by which foreign relations are conducted, and the power to conduct foreign relations is given to the President by the Constitution.[1]

The real question in any given case is whether and to what extent the President's action in negotiating or concluding an international agreement affects the law of the United States, the legal obligations or powers of the United States, or the rights of its citizens or other persons subject to Federal law. In the absence of prior statutory authorization, the answer to this question turns in large part upon the procedures that are followed *after* an international agreement has been concluded. If the agreement is submitted to the Senate for

---

[1]Indeed, quite apart from the question of authorization, we think it doubtful that the President's power to negotiate with foreign governments over subjects of national concern can ever be subject to unqualified restriction by statute. The President can make treaties on virtually any subject, and treaties can supplant prior statutes. *See, Cook* v. *United States* 288 U.S. 102 (1933). We think it follows that Congress could not make it unlawful for the President to conclude treaties on particular subjects (even on subjects within the legislative jurisdiction of Congress), or to participate in the antecedent negotiations. Moreover, we think it doubtful that Congress could make the legality of a particular negotiation depend upon the submission of any resulting agreement to the Congress or to the Senate under the treaty clause. *See, United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (Congress "powerless" to invade field of international negotiation).

approval under the treaty clause, it becomes a law of the United States upon the approval of two-thirds of the Senators present; and, as a matter of municipal law, it then has the same force and effect as an act of Congress if it is self-executing. If the agreement is submitted to the full Congress and is approved by joint resolution or is implemented by statute, it is likewise entitled to the force and effect of an act of Congress to the extent of the approval or implementation.

Finally, if the agreement is approved neither by the Senate (as a treaty) nor by the Congress (through joint resolution or statute), it may yet have some legal effect, depending on the subject matter, *see, United States* v. *Belmont,* 301 U.S. 324 (1937). But here we encounter a series of problems for which, as Professor Henkin has said, there is no real legal solution. As a matter of domestic law the legal effect of a naked executive agreement is uncertain. On the negative side, in one of the few cases on this subject the Fourth Circuit held that in the face of a valid, conflicting statute a naked executive agreement can have no force or effect as a law or obligation of the United States. *United States* v. *Guy W. Capps, Inc.* 204 F. (2d) 655 (4th Cir. 1953) (Parker, J.), *aff'd on other grounds,* 348 U.S. 296 (1955).

The agreements or recommendations made as a result of the negotiations conducted in a PCF do not purport to be self-executing or binding on the parties themselves or on the private participants. The participating governments are free to take whatever action they wish to implement the recommendations or agreements. The United States generally takes no action, formal or informal, to implement them. In accordance with the principles we have just described, we think that the President, through the Secretary of State and his representatives, has constitutional authority to participate in PCF negotiations. The fact that the President does not elect to submit the ensuing agreements to the Senate or the Congress for approval does not in our judgment deprive him of such negotiating authority.[2] Under both the agreements and the Constitution, the President is free to decide what implementing action, if any, he will take. The legal effect of these agreements or actions taken pursuant to them upon public or private rights or liabilities under the antitrust laws will depend largely on those laws. To the extent that this impact is determined by the status of these agreements as laws or obligations of the United States, we think there is substantial doubt that agreements of this kind can be regarded as laws or obligations of the United States absent implementing legislation or approval under the treaty clause.

---

[2]We are supported in this conclusion by *Consumers Union of U.S., Inc.* v. *Kissinger,* 506 F. (2d) 136 (D.C. Cir. 1974), which is very nearly in point. We express no opinion on the question whether any "agreement" concluded pursuant to PCF negotiations is an "international agreement" in the Case Act sense. *See* 1 U.S.C. § 112b.

### III. The Statutory Issue

You asked whether the Trade Act of 1974 authorizes or permits the President to participate in PCFs through the Secretary of State. Since we have already concluded that the Constitution provides a source of negotiating authority, this question is significant only if Congress, by enacting the Trade Act of 1974, preempted the field and provided, through legislation, the exclusive means by which negotiations of this kind may be conducted.

As noted above, we believe that there may be a constitutional limitation on the power of Congress to restrict the power of the President to negotiate with foreign governments over matters of national concern. For that reason alone, we would be very reluctant to construe an act of Congress as an attempt to dictate in advance either the mode of an international negotiation or the criteria for ultimate agreement. The legal force of a particular international agreement may depend upon the presence or absence of congressional authorization; but, as a matter of constitutional principle, the President must be free to negotiate agreements in his conduct of foreign affairs and to subject them to ratification or legislative implementation if he wishes them to have a desired force or effect under our law.

In any case, we do not construe the Trade Act of 1974 as an attempt to prevent the President from engaging in informal, nonbinding negotiations such as those involved in a PCF. The Act provides a mechanism for negotiation and administrative action with respect to many trade-related questions, including the ones dealt with in PCFs. In addition, the Act gives the President powers that he clearly would not have in the absence of some congressional authorization (*see, e.g.*, 19 U.S.C. § 2253) (power to increase duties on imported articles causing serious competitive injury to domestic industry). It is plain that if the President wishes to exercise the specific powers conferred by the Act, he must do so pursuant to the procedures and in accordance with the standards prescribed in the Act. But we find no intent to restrict Presidential participation in international negotiations leading to recommendations which do not bind the United States and do not purport to have the force and effect of law. *See, Consumers Union of U.S. Inc.* v. *Kissinger, supra.*

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

230